IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| ERIC PEEBLES, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 3:19-cv-928-SMD |
| AUBURN UNIVERSITY, | ) ) ) |
| Defendant. | ) ) |

## **OPINION & ORDER**

Plaintiff Eric Peebles ("Peebles") was born with spastic cerebral palsy, a condition which severely limits his motor skills. *Peebles Dep.* (Doc. 39-1) p. 101. After graduating from Auburn University ("Auburn") with a Ph.D. in rehabilitation and special education, Auburn hired Peebles as a part-time instructor in the Special Education, Rehabilitation, and Counseling Department. *Id.* at 43-44, 78. While teaching an undergraduate course in 2018, a female student made a Title IX complaint against Peebles based on interactions with him that she considered to be of an inappropriate sexual nature. *Taylor Dep.* (Doc. 39-5) p. 150. Auburn investigated the student's complaint and determined that Peebles's conduct violated Title IX as well as Auburn's Intimate Relations Policy. *Id.* at 172-73.

Peebles now brings this action against Defendant Auburn, raising disability discrimination and failure to accommodate claims in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 ("Rehabilitation Act"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 ("ADA"). *Compl.* (Doc. 1) pp. 3-4, ¶¶ 14-18. Before the Court is Auburn's Motion for Summary Judgment (Doc. 32) and accompanying brief and

evidentiary materials in support (Docs. 33, 34, 35, 36, 39). For the following reasons, Auburn's Motion (Doc. 32) is GRANTED.

## I.   LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The legal elements of a claim determine which facts are material and which are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is not material if a dispute over that fact would not affect the outcome of the case under the governing law. *Id.*

A court must view the proffered evidence in the light most favorable to the nonmovant and resolve all reasonable doubts about the facts in the nonmovant's favor. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1242-43 (11th Cir. 2001). The nonmovant must produce sufficient evidence to enable a jury to rule in his favor; a mere scintilla of evidence in support of a position is insufficient. *Id.* at 1243. In sum, summary judgement is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *City of Delray Beach v. Agric. Ins. Co.*, 85 F.3d 1527, 1530 (11th Cir. 1996)).

When a plaintiff fails to respond to a defendant's motion for summary judgment, "the district court cannot base the entry of summary judgment on the mere fact that the

motion was unopposed, but, rather, must consider the merits of the motion." *U.S. v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101-02 (11th Cir. 2004) (quoting *Dunlap v. Transam. Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988)). While a court "need not *sua sponte* review all of the evidentiary materials on file at the time the motion is granted," it must, at a minimum, ensure that the motion is supported by reviewing the evidentiary materials filed in its support. *Id.* Additionally, if summary judgment is granted, the court's order must indicate that the merits of the motion were addressed in order to ensure an effective review on appeal. *Id.* at 1101-02.

## II.    MATERIAL FACTS[1]

### A.    Peebles's Background

Peebles was diagnosed at birth with spastic cerebral palsy, which severely limits his motor skills. *Peebles Dep.* (Doc. 39-1) p. 101. In August 2016, Peebles received his Ph.D. in rehabilitation and special education from Auburn. *Id.* at 43-44. Later that year, Auburn approved Peebles to be a part-time instructor for the 2017 spring semester. *Carney Decl.* (Doc. 39-3) p. 2, ¶ 3. He was employed to teach an undergraduate course in the Special Education, Rehabilitation, and Counseling ("SERC") Department at Auburn. *Id.* Auburn renewed Peebles's employment for fall 2017 and spring 2018 semesters, but did not employ him to teach in fall 2018. *Id.* at ¶¶ 4-6. When Peebles was not teaching, Auburn classified him as a temporary employee. *Peebles Dep.* (Doc. 39-1) pp. 78-82.

---

[1] Because Peebles failed to respond to Auburn's Motion for Summary Judgment, the facts set forth in this section are drawn from Auburn's Brief in Support of Its Motion for Summary Judgment. (Doc. 33). The Court has independently verified that each statement of fact is supported by the evidence and has supplied appropriate citations to the evidence.

### B. Auburn

Auburn is a public land grant university located in Auburn, Alabama. *The Morrill Act at Auburn*, AUBURN UNIV., http://www.auburn.edu/outreach/morrillact/atauburn.htm (last updated Oct. 24, 2018). Auburn has approximately 30,000 enrolled students and 5,000 full-time employees. *Taylor Decl.* (Doc. 39-4) p. 2, ¶¶ 2, 3. During the time relevant to this lawsuit, Auburn had a "Policy on Sexual and Gender-Based Misconduct" ("Title IX Policy"), which was administered by the Title IX Coordinator, Kelley Taylor. *Taylor Decl.* (Doc. 39-4) p. 2, ¶ 6; *Taylor Dep.* (Doc. 39-5) pp. 10-14. Auburn also maintained an Intimate Relations Policy, which prohibited its employees from pursuing or engaging in romantic or sexual relationships with students and/or employees that they currently supervise or teach. *Taylor Decl.* (Doc. 39-4) p. 3, ¶ 8; *Taylor Dep.* (Doc. 39-5) p. 131.

Auburn's Title IX Policy provided two forms of resolution for complaints: (1) Formal Resolution and (2) Alternative Resolution. *Taylor Dep.* (Doc. 39-5) pp. 94-130. Participation in Alternative Resolution is completely voluntary, and any resolution reached through the alternative process must be agreeable to the complainant, respondent, and the University. *Id.* As part of the Alternative Resolution process for a Title IX Complaint, investigators from Auburn's Office of Affirmative Action/Equal Employment Opportunity ("AA/EEO Office") conduct interviews with the complainant and respondent to determine what the terms of the agreement will be and then present the terms of the agreement to the Title IX Coordinator for approval. *Taylor Decl.* (Doc. 39-4) p. 3, ¶ 11. The investigators' participation in the Alternative Resolution process does not convert the process into a Formal Resolution. *Taylor Decl.* (Doc. 39-4) p. 4, ¶ 12; *White Decl.* (Doc. 39-6) pp. 2-4.

### C.    Peebles's Relationship with Student Jane Doe

Jane Doe ("Doe")[2] was a student in Peebles's spring 2017 class. *Peebles Dep.* (Doc. 39-1) p. 137. As part of his course syllabus, Peebles made his personal cell phone number available to his students. *Id.* at 139. Doe began texting Peebles about the course. *Id.* at 141-42, 159-60. Doe's texts to Peebles also included information about her personal life. *Id.* at 142-43. In one string of messages, for instance, Doe told Peebles that she was sorry for missing class due to personal issues and having to move, at which time Peebles offered to "stash her" in a safe place if she needed somewhere to go. *Id.* Peebles likewise told Doe about his personal life. *Id.* at 147-48. For example, Peebles confided in Doe that his caretaker had received a DUI. *Id.* at 147-48.

Peebles recognized his relationship with Doe was moving beyond the typical professor/student relationship. *Id.* at 149. On April 15, 2017, Peebles explained to Doe that because "the conversation has crossed so many ethical boundaries already :-) let's do one more. When we're not around the others you could call me Eric." *Id.* at 183.

In fall 2017, Doe asked to earn practicum credit by assisting Peebles with manual tasks in class. *Id.* at 196. She enrolled in Peebles's fall course and served as Peebles's student and class aide, making Peebles both her professor and supervisor. *Id.* at 94-96, 181. On October 22, 2017, Doe texted Peebles explaining that she was probably "crossing the line," but that she loved Peebles. *Peebles Dep. Continuation* (Doc. 39-2) p. 16. Peebles responded that he "was thinking the same thing" and that, "as long as [he] could remain

---

[2] The Court refers to the student as Jane Doe in order to protect her privacy.

objective," it didn't bother him. *Id.* Peebles later acknowledged that, at that point in the relationship, he should have "shut the text messages down" and that continuing the conversation was "an error in judgment." *Peebles Dep.* (Doc. 39-1) pp. 158-62.

Nonetheless, between October 22, 2017, and May 2, 2018, Peebles continued to text with Doe. He told her that he loved her; called her "baby" or "babe," "girlfriend," and "gorgeous"; and asked Doe for hugs and referenced receiving them. *Peebles Dep. Continuation* (Doc. 39-2) pp. 1-254. On December 4, 2017, Peebles texted Doe that he had a "surprise" for her involving "fun Christmas stuff." *Id.* at 94. The Christmas surprise was a trip to Birmingham to see the Nutcracker ballet. *Peebles Dep.* (Doc. 39-1) pp. 169-70. During that semester, Peebles was supervising another practicum student, but he did not invite that student on the trip to Birmingham. *Id.* at 171-73. Peebles had never taken any of his other students on overnight trips. *Id.* at 172.

Doe accompanied Peebles and his caretaker to Birmingham for the Nutcracker show. *Id.* at 35-39. Peebles's caretaker stayed the night with her family, while Doe stayed in a hotel room with Peebles. *Id.* at 35. The next day, Peebles and Doe shopped for a gift for the child of Peebles's friends, with whom they attended lunch. *Id.* at 35-37. Peebles, his caretaker, and Doe returned to Auburn the next evening. *Id.*

In the spring 2018 semester, Doe was supposed to continue serving as an aide in Peebles's classes and assisting with his non-profit organization for practicum credit. *Id.* at 180-81. However, Doe did not "make herself available" to Peebles often during that semester. *Id.* at 40-41, 138.

### D. Doe's Complaint and Following Investigation

Doe made a complaint about Peebles to the AA/EEO Office in the fall 2018 semester by sending an email to Kelley Taylor. *Taylor Dep.* (Doc. 39-5) pp. 53-54, 150. Taylor believed that Does allegations could constitute a violation of Auburn's Title IX Policy and Intimate Relations Policy. *Id.* at 150. Taylor met with Doe for an initial interview on August 9, 2018. *Id.* at 56-57. During the interview, Doe explained the "weird" things that happened between herself and Peebles, such as "creepy text messages," an inappropriate email, calling her beautiful, getting jealous that she had a boyfriend, asking her for hugs, and taking her on an overnight trip to Birmingham. *Id.* at 58, 154-55. Taylor explained to Doe the procedure for investigating sexual harassment complaints under the Title IX Policy and the Intimate Relations Policy. *Taylor Decl.* (Doc. 39-4) p. 4, ¶ 15; *Taylor Dep.* (Doc. 39-5) pp. 154-55. Doe was interested in resolving her complaint through the Alternative Resolution process rather than the Formal Resolution process under the Title IX Policy. *Taylor Dep.* (Doc. 39-5) p. 69.

Doe met with Kim White and Michelle Martin, investigators in the AA/EEO Office, on September 10, 2018. *White Decl.* (Doc. 39-6) p. 3, ¶ 6. At the meeting, Doe described what happened with Peebles in more detail. *Id.* at ¶ 8. She stated that Peebles scheduled lunch meetings for her practicum credit where she would have to feed him; that Peebles would call her "baby" in front of students; and that he texted her, "good morning, gorgeous." *Id.* Doe informed the investigators that the four terms acceptable to her to resolve the dispute in Alternative Resolution were: (1) Peebles would not have any students who are currently enrolled in his classes serve as his aides; (2) Peebles and Doe would have

no contact; (3) Doe would be removed from Peebles's Accessible Alabama website; and (4) Peebles would agree not to talk to other students about Doe. *White Decl.* (Doc. 39-6) p. 3, ¶ 9. Doe followed up with the investigators after meeting with them and provided screen shots of text messages and an email she had received from Peebles that she believed to be inappropriate. *White Decl.* (Doc. 39-6) p. 4, ¶ 10.

On September 17, 2018, Taylor emailed Peebles a "Notice of Investigation" pursuant to the Intimate Relations Policy. *Taylor Decl.* (Doc. 39-4) pp. 4-5, ¶ 18. Taylor requested that Peebles meet with White and Martin, but informed him that his participation in the investigation was not mandatory. *Taylor Decl.* (Doc. 39-4) p. 5, ¶ 20. The email explained that Peebles had the right to an advisor during the meeting, but that the advisor could not speak on his behalf. *Id.* The email further explained that if he needed an accommodation for the meeting, the AA/EEO office could assist. *Id.*

On September 18, 2018, Taylor emailed a "Notice of Complaint and Opportunity for Alternative Resolution" pursuant to the Title IX Policy to Peebles. *Id.* at ¶ 19. The letter notified Peebles of Doe's allegations, a potential violation of the Title IX Policy, and that Doe was willing to engage in the Alternative Resolution process. *Taylor Decl.* (39-4) p. 6, ¶¶ 28-30. Taylor requested that Peebles call her to schedule a meeting to discuss the policy and the Alternative Resolution process. *Taylor Decl.* (39-4) p. 24. The email again notified Peebles that he could decline to participate in the Alternative Resolution process. *Taylor Decl.* (Doc. 39-4) p. 23. It further informed Peebles that he had the right to have an advisor present, who was not permitted to speak on his behalf, and that the AA/EEO Office could assist with an accommodation if necessary. *Taylor Decl.* (Doc. 39-4) p. 24.

Peebles, along with his attorney Paul Fullum, met with members of the AA/EEO Office on September 24, 2018. *Taylor Decl.* (Doc. 39-4) p. 5, ¶¶ 23, 24; *White Decl.* (Doc. 39-6) p. 4, ¶¶ 11, 12. First, Peebles met with Taylor, who explained to him the procedure for the Alternative Resolution to the Title IX complaint and that investigators were independently looking at whether there was a violation of the Intimate Relations Policy. *Taylor Dep.* (Doc. 39-5) pp. 118-19. Taylor explained to Peebles that there were two separate policies and potential policy violations at issue, and Peebles stated that he understood. *Id.*

During Peebles's meeting with Taylor, he first requested an accommodation that Fullum be allowed to speak on his behalf. *Id.* at 110-11, 113. Taylor explained that, unless it is an interpretation, Fullum would not be allowed to speak on his behalf. *Id.* Taylor had no difficulty understanding Peebles and was therefore unsure how Fullum would "interpret" what Peebles was saying.[3] *Id.* at 114. Nevertheless, Fullum spoke during the meeting with Taylor. *Id.* at 114-17.

Next, Peebles and Fullum met with White and Martin. *White Decl.* (Doc. 39-6) p. 4, ¶ 11. Fullum claimed to invoke "the ADA Amendment" and stated that Peebles may need to take breaks to get a drink if he had problems talking. *Id.* at ¶ 14. White and Martin encouraged Peebles to take as many breaks as needed during the process. *Peebles Dep.*

---

[3] Notably, even Peebles cannot say how Fullum would have assisted him in the process. *Peebles Dep.* (Doc. 39-1) pp. 97-99 (stating that he cannot speculate what statements Fullum would have made to justify the text messages but he questioned the wisdom in turning them over and that he "can't speculate" how having a translator would have helped but that he would have provided a more coherent version of the facts).

9

(Doc. 39-1) pp. 102-04. They explained that there were two separate policies and potential policy violations at issue, Title IX and the Intimate Relations Policies, and asked whether Peebles had questions about them. *White Decl.* (Doc. 39-6) p. 4, ¶ 14. Peebles said he had reviewed the two policies before he came to the meeting. *Id.* White specifically asked whether Taylor had explained the Intimate Relations Policy to him. *Id.* at ¶ 15. Peebles said she only explained the Title IX Policy to him but that he had already reviewed the Intimate Relations Policy and did not need to review the copy White provided. *Id.*

Peebles informed White and Martin that he and Doe had exchanged 4,000 text messages over the course of a year. *White Decl.* (Doc. 39-6) pp. 4-5, ¶ 16. He also stated that he believed that the ratio of text messages expressing love were "strongly toward her." *Id.* White explained that, according to the Intimate Relations Policy, a professor or supervisor cannot engage in or pursue a romantic relationship with a student they were teaching or supervising regardless of whether the student is interested in a romantic relationship, consented to a romantic relationship, or was the pursuer of a romantic relationship. *White Decl.* (Doc. 39-4) p. 5, ¶ 16. Instead, the decision matrix for the Intimate Relations Policy is (1) whether the employee teaches or supervises the person, and (2) whether a reasonable person would think that the employee engaged in or pursued a romantic or sexual relationship with that person. *Id.* ¶ 17.

Peebles offered to provide the full history of his text messages with Doe and other documents to provide the full context of their relationship. *Peebles Dep.* (Doc. 39-1) at p. 108. White then explained the terms Doe requested for the Alternative Resolution. *White Decl.* (Doc. 39-6) p. 5, ¶ 19. Peebles agreed to those terms. *Peebles Dep.* (Doc. 39-1)

pp. 120-21. White told Peebles and Fullum that the next steps under the Title IX Alternative Resolution process were to check and see if the terms were still agreeable to Doe, and to check with Taylor, the Title IX coordinator, about whether the terms were acceptable to the University. *White Decl.* (Doc. 39-6) p. 5, ¶ 20. As for the Intimate Relations Policy investigation, White said she would review the additional material provided by Peebles and would be in touch if she had any questions. *Id.* at ¶ 21. Fullum spoke during this meeting with White and Martin as well. *White Decl.* (Doc. 39-6) p. 6, ¶ 23.

On September 26, 2018, Peebles sent an email to White attaching his complete text history with Doe and providing a further explanation of his relationship with her. *Id.* at ¶ 24. In the email, Peebles called Doe a "psychologically troubled student who was going through a period of great stress," and said her family was "dysfunctional" due to her "alcoholic father" and pressure from her mother to become self-supporting. *Id.* at ¶ 25. Peebles claimed Doe "misunderstood" his mentorship as "something more personal." *Id.*

Taylor, White, and Martin independently reviewed the thousands of text messages between Doe and Peebles. *Taylor Dep.* (Doc. 39-5) p. 116. They believed that the messages corroborated Doe's account that Peebles had taken her on an overnight trip to Birmingham; he repeatedly told her "I love you;" he called her "gorgeous," "baby," and "babe;" and he asked her for hugs. *White Decl.* (Doc. 39-6) p. 6, ¶ 26; *Taylor Decl.* (Doc. 39-4) p. 6, ¶ 28.

On October 23, 2018, Taylor sent both Doe and Peebles Notices of Outcome related to the Title IX aspects of Doe's complaint. *Taylor Dep.* (Doc. 39-5) pp. 173, 180. These Notices of Outcome detailed the terms of the Alternative Resolution agreeable to Doe,

Peebles, and the University. *Id.* This resolved Doe's complaint as it related to the Title IX Policy. *Taylor Decl.* (Doc. 39-4) p. 6, ¶ 30.

On the same day, Taylor also sent Peebles a Notice of Outcome with regards to the Intimate Relations Policy. *Taylor Dep.* (Doc. 39-5) p. 172. The Notice explained the University's finding that Peebles had violated the policy when he called Doe "baby" or "babe" in class in front of other students, called Doe "gorgeous," told Doe that he loved her, asked Doe for hugs, took Doe on an overnight trip, wrote excuses for Doe for other instructors' classes, loaned Doe money, and possibly changed Doe's grade. *Id.*

On October 23, 2018, Taylor also sent a letter to Dr. Jamie Carney, the Department Chair for SERC. *Taylor Decl.* (Doc. 39-4) pp. 6-7, ¶ 32; *Carney Decl.* (Doc. 39-3) pp. 6-7. This letter explained the findings of the AA/EEO Office's investigation into Peebles's behavior and recommended not rehiring him based on his violation of the policy. *Carney Decl.* (Doc. 39-3) pp. 6-7. This was the first time Carney learned of Doe's complaint and the AA/EEO Office's investigation into Peebles. *Carney Decl.* (Doc. 39-3) p. 3, ¶ 9. Carney terminated Peebles on Wednesday, October 24, 2018. *Id.* at ¶ 11.

### III. ANALYSIS

#### A. Auburn is entitled to summary judgment on Peebles's ADA claims.

Auburn is entitled to summary judgment on Peebles's ADA claims because, as an arm of the State, Auburn enjoys Eleventh Amendment immunity from those claims. The Eleventh Amendment states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign

State." U.S. Const. amend. XI. It has been further established that, although the express language of the Eleventh Amendment does not bar suits against a state by its own citizens, an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens. *Carr v. City of Florence,* 916 F.2d 1521, 1524 (11th Cir. 1990) (citing *Hans v. Louisiana,* 134 U.S. 1 (1890)). Furthermore, it is "well-settled that Eleventh Amendment immunity bars suits brought in federal court when an 'arm of the State' is sued." *Manders v. Lee,* 338 F.3d 1304, 1308 (11th Cir. 2003) (quoting *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 280 (1977)); *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n,* 450 U.S. 147, 147 (1981) (holding that an agency of state government is part of the state for Eleventh Amendment purposes).

Auburn is an arm of the State of Alabama, and thus enjoys sovereign immunity under the Eleventh Amendment.[4] Absent a valid waiver or abrogation, Auburn may not be sued in federal court for either money damages or injunctive relief. *See, e.g., Foster v. Auburn Univ. Montgomery*, 2012 WL 786959, at *2 (M.D. Ala. Mar. 12, 2012) ("a private citizen, like [the plaintiff], is barred by the Eleventh Amendment from bringing claims for monetary damages or injunctive relief against AUM under Title I of the ADA."). Such claims brought by private individuals must be dismissed for lack of subject-matter

---

[4] *See, e.g.*, ALA. CONST. ART. XIV, § 266; *Jurriaans v. Ala. Coop. Extension Sys.*, 2017 WL 3902571, at *2 (M.D. Ala. Aug. 7, 2017) ("The law is clear that state universities in Alabama are considered an agency or instrumentality of the state."); *Price v. Univ. of Ala.*, 318 F. Supp. 2d 1084, 1088 (N.D. Ala. 2003) ("The question of whether an Alabama university is an agency or instrumentality of the state and thus immune from suit has been answered in the affirmative on a number of occasions."); *Gulf State Park Auth. v. Gulf Beach Hotel, Inc.*, 22 So. 3d 432, 435 (Ala. 2009) (holding Auburn University is the "state" under ALA. CONST. ART. I, § 14).

jurisdiction.[5] Because Auburn enjoys Eleventh Amendment immunity as to Peebles's ADA claims, Auburn's Motion for Summary Judgment is granted as it relates to those claims.

### B. Auburn is entitled to summary judgment on Peebles's disability discrimination claims under the Rehabilitation Act.

Auburn is entitled to summary judgment on Peebles's disability discrimination claims under the Rehabilitation Act because Peebles cannot establish a prima facie case of disparate treatment, nor can he show that Auburn's reason for terminating him was pretextual. The Rehabilitation Act prohibits federally funded agencies from discriminating in employment against individuals with disabilities. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Under the Rehabilitation Act,[6] a plaintiff may establish a prima facie case of disability discrimination in two ways: (1) via direct evidence of discriminatory intent, or (2) by meeting the *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 792 (1973), burden-shifting test. *See Porterfield v. Saul*, 2019 WL 6701974, at *5 (N.D. Ala. Dec. 9, 2019) (describing the methods of proving a prima facie case in disparate treatment claims). Peebles has offered no direct evidence of discrimination;[7] therefore, he must proceed under the *McDonnell Douglas* framework.

---

[5] *See Rizo v. Ala. Dep't of Hum. Res.*, 228 F. App'x 832, 834–35 (11th Cir. 2007) (per curiam) (affirming dismissal of ADA claims for money damages against the state of Alabama); *Foster*, 2012 WL 786959, at *2 (dismissing ADA claims for monetary and injunctive relief against Auburn); *Cobb v. Ala.*, 2011 WL 3666696, at *2 (M.D. Ala. Aug. 22, 2011) (dismissing ADA claims for monetary and injunctive relief, including reinstatement, against the State as barred by the Eleventh Amendment).

[6] "The standard for determining liability under the Rehabilitation Act is the same as that under the ADA." *Sutton v. Lader*, 185 F.3d 1203, 1207 n.5 (11th Cir. 1999); *see also* 29 U.S.C. § 791(f).

[7] "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [disability], . . . constitute direct evidence of discrimination." *Van Voorhis v. Hillsborough*

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of disparate treatment. *McDonnell*, 411 U.S. at 801. If a prima facie case is established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* Then, the ultimate burden of proof shifts back to the plaintiff to show that the defendant's reason is pretextual. *Id.* at 804.

### 1. *Peebles cannot show his termination was because of his disability.*

To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show that: (1) he has a disability, (2) he was otherwise qualified for the position, and (3) he was subjected to unlawful discrimination as the result of his disability. *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1310 (11th Cir. 2007). Satisfaction of the third element requires a plaintiff to show that he suffered an adverse employment action *solely* because of his disability. *Ellis*, 432 F.3d at 1326; *see also Meyer v. Sec'y, U.S. Dep't of Health & Human Servs.*, 592 F. App'x 786, 789 (11th Cir. 2014) ("We apply the plain meaning of the phrase 'solely by reason of,' and Meyer cannot prevail if she shows that HHS based her termination partially on her disability and partially on other factors."). In other words, it is not sufficient for a plaintiff "to demonstrate that an adverse action was based partly on his disability." *Ellis*, 432 F.3d at 1326.

---

*Cty. Bd. of Cty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (internal quotes omitted). In reviewing the record, the undersigned finds that there is no direct evidence that Auburn terminated him because of his disability. Therefore, Peebles must proceed by proving his case through indirect evidence via the *McDonnell Douglas* framework.

Auburn proffers that it terminated Peebles because he violated its Intimate Relations Policy. In the AA/EEO Office's Notice of Outcome regarding its investigation into Peebles's conduct, Taylor states:

> While we did not find that you engaged in or pursued a sexual relationship with the student, we did find that you pursued a romantic relationship with her. Your conduct included calling the student "baby" or "babe" in class in front of other students, calling the student "gorgeous," telling the student you love her, asking the student for hugs, taking the student on an overnight trip, writing excuses for the student to give to instructors when she overslept, loaning or giving the student money, and possibly changing the student's grade.

*Taylor Dep.* (Doc. 39-5) p. 172. Taylor sent the results of her investigation to Dr. Carney, the SERC department head, who was responsible for hiring and firing instructors. *Carney Decl.* (Doc. 39-3) p. 3, ¶ 9. Dr. Carney made the decision to terminate Peebles. *Id.* at ¶ 11. There is no evidence that anything other than Peebles's violation of the Intimate Relations Policy motivated Dr. Carney to terminate him. Therefore, Peebles cannot raise a genuine dispute of material fact as to whether his termination was due, at least in part, to his violation of University policy. Accordingly, Auburn's Motion for Summary Judgment, as it pertains to Peebles's Rehabilitation Act claim, is granted.

> **2.  *Peebles cannot show that Auburn's legitimate, nondiscriminatory reason for terminating him was pretextual.***

Assuming *arguendo* that Peebles could establish a prima facie case of discrimination under the Rehabilitation Act, the burden would shift to Auburn to articulate a legitimate, nondiscriminatory reason for its employment action. *See Center v. Sec'y, Dep't of Homeland Sec., Customs, & Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir.

2018). Auburn has done so by proffering that Peebles's termination was due to his violation of the Intimate Relations Policy.

Because Auburn has offered a legitimate, non-discriminatory reason for Peebles's termination, the burden returns to Peebles to show that Auburn's reason for termination is unworthy of credence and a pretext for discrimination. To demonstrate pretext, Peebles "must show both (1) that [Auburn's] proffered reason was false, and (2) that discrimination was the real reason for [Auburn's] action." *Forsyth v. Univ. of Ala. Bd. of Trs.*, 2020 WL 3129864, at *15 (N.D. Ala. June 12, 2020). Peebles must present actual evidence to satisfy this burden: "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext . . . ." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1313 (11th Cir. 2016) (alteration in original) (quoting *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)).

Here, Peebles voluntarily provided Auburn with evidence of his relationship with Doe, turning over approximately 4,000 text messages to the AA/EEO Office. Those text messages established much of the conduct which Auburn found to violate the Intimate Relations Policy and ultimately led to his termination. Peebles admits that his relationship with Doe progressed beyond that of a typical professor/student and that the relationship—much of which was corroborated through the text messages he provided—could be considered a violation of Auburn's policy. *Peebles Dep.* (Doc. 39-1) pp. 94-97, 109-10, 180, 185, 158-62. Peebles also admits that Auburn could have considered his conduct a violation of the Intimate Relations Policy. In his deposition, Peebles stated:

>Q. But when you continuously told [Doe] that you love her, you can see why Auburn University found that was a violation of the intimate relationship policy.
>
>A. . . . [W]ithout looking at the totality of the circumstances, I could see – I could see where someone would conclude that, yes.

*Id.* at 95-96.

Peebles cannot show that Auburn's proffered reason for termination is false pretextual. Peebles admitted that he called Doe "baby" or "babe" in class in front of other students, called her gorgeous, told her he loved her, asked her for hugs, took her on an overnight trip, wrote her excuses for other professors, and loaned her money. *Id.* at 133-134. Any of these actions alone might have constituted a violation of the Intimate Relations Policy and provided Auburn with a legitimate, non-discriminatory reason to terminate Peebles's employment. Considering these actions together, a reasonable juror could not conclude that Peebles's actions did not justify Auburn's determination that the Intimate Relations Policy was violated. Accordingly, Peebles cannot demonstrate that Auburn's reason for terminating him—i.e., that he violated the Intimate Relations Policy—was false, or that discrimination was the real reason for the decision. Accordingly, Auburn's Motion for Summary Judgment, as it pertains to Peebles's Rehabilitation Act claim, is granted.

### C. Auburn is entitled to summary judgment on Peebles's failure-to-accommodate claim under the Rehabilitation Act.

Auburn is entitled to summary judgment on Peebles's failure-to-accommodate claim because Auburn was not required to provide Peebles with his requested accommodation. Peebles asserts that Auburn's denial of his request to use an "interpreter,"

"proxy," or "translator" to speak on his behalf during his meetings with the AA/EEO Office prevented him from "fully and effectively" participating in the meeting. *Peebles Dep.* (Doc. 39-1) pp. 89-92. However, Peebles's claim fails as a matter of law because his participation in the investigatory meeting was not an essential function of his job.

Under the Rehabilitation Act, "[a]n accommodation is reasonable and necessary . . . only if it will enable the employee to perform the essential functions of the job." *Salem v. City of Port St. Lucie*, 788 F. App'x 692, 694 (11th Cir. 2019). In general, disciplinary proceedings are not "essential functions" of a job. *See, e.g.*, *Novella*, 226 F. App'x at *2 ("[W]e conclude that communication at a termination meeting, the purpose of which is to give the employee notice of his termination, is not an 'essential function' of an employee's job."); *Schneider v. Wal-Mart Stores, Inc.*, 2019 WL 294309, at *7 (S.D.N.Y. Jan. 23, 2019) ("A disciplinary process hardly requires any action on the part of the disciplined employee and any required action by the employee, while related to their personal employment, could not be related to the performance of an essential job function."). Therefore, Auburn was not required to provide Peebles with a reasonable accommodation during the meetings that arose from Doe's Title IX complaint.

This conclusion is further supported by the fact that Peebles's participation in the Title IX Alternative Resolution process and Intimate Relations Policy investigation was not an essential function of his specific job. Essential functions are the "fundamental duties" of a position that the employee was "actually required to perform." *Salem*, 788 F. App'x at 694 (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007)). Auburn does not consider participation in AA/EEO investigations to be essential

functions of an employee's job. *Carney Decl.* (Doc. 39-3) at p. 3, ¶ 8; *Taylor Decl.* (Doc. 39-4) at p. 5, ¶ 22. Additionally, Auburn's notice to Peebles regarding the Intimate Relations Policy investigation specifically informed him that he was "not required to participate in [the] investigation." *Taylor Decl.* (Doc. 39-4) pp. 5, ¶¶ 20, 18-19; *Peebles Dep.* (Doc. 39-1) p. 114. Likewise, Peebles's participation in the Title IX Alternative Resolution process was clearly not mandatory. *Taylor Decl.* (Doc. 39-4) p. 5, ¶ 21. Peebles was not required to participate in the meetings with the AA/EEO Office or the AA/EEO's investigation. Accordingly, participation in the meeting was not an "essential function" of Peebles's job. The Court therefore grants Auburn's Motion for Summary Judgment as to Peebles's failure to accommodate claim under the Rehabilitation Act.

### IV. CONCLUSION

For these reasons, Auburn's Motion for Summary Judgment (Doc. 32) is GRANTED and Peebles's claims are DISMISSED in their entirety WITH PREJUDICE. It is further ORDERED that Auburn's Motion for Entry of Judgment (Doc. 46) is DENIED as moot. The Court shall issue a final judgment by separate order.

DONE this 31st day of March, 2021.

/s/ Stephen M. Doyle
Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE